# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

CANDICE A. DIXSON,

               Plaintiff,                       Case No. 6:12-cv-00242-ST

        v.                                **OPINION AND ORDER**

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

               Defendant.

**STEWART, Magistrate Judge:**

<u>INTRODUCTION</u>

Plaintiff, Candice A. Dixson ("Dixson"), seeks judicial review of a final decision by the Social Security Commissioner ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 USC §§ 401–33. This Court has jurisdiction pursuant to 42 USC § 405(g). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to FRCP 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

## ADMINISTRATIVE HISTORY

Dixson protectively filed for DIB and SSI on June 18, 2008, alleging a disability onset date of March 12, 2006.  Tr. 121-31.[2]  After her applications were denied both initially and on reconsideration, Dixson requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 68-90.  On July 13, 2010, ALJ Edward H. Hein held a hearing at which Dixson was represented and testified, as did a Vocational Expert ("VE").  Tr. 30–62.  On July 30, 2010, the ALJ issued a decision finding Dixson not disabled within the meaning of the Act.  Tr. 12-21.  On December 8, 2011, the Appeals Council denied Dixson's request for review, making ALJ Hein's decision the final decision of the Commissioner.  Tr. 1–3; 20 CFR §§ 404.981, 416.1481.

## BACKGROUND

Dixson was 25 years old at the time of the hearing and 21 years old at the time of her alleged onset date.  Tr. 150.  She is a high school graduate.  Tr. 157.  She has past relevant work as a customer service clerk, a material handler, and a customer service representative.  Tr. 42-45, 151.  Dixson alleges that she became unable to work on March 12, 2006, due to back problems and drug addiction.  Tr. 150.

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

---

[2] Citations are to the page(s) indicated in the official transcript of record filed on August 6, 2012 (docket #6).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12–month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt P, App 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96–8p, *available at* 1996 WL 374184.

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work ("PRW").  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant cannot perform PRW, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs

exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this

burden, then the claimant is not disabled.  20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ found that Dixson has not engaged in any substantial gainful activity

since the alleged onset date of disability.  Tr. 14.  At step two, the ALJ determined that Dixson

suffers from the following severe impairments:  T12-L1 and L4-S1 discogenic degenerative

changes, status post right L4-5 microdiscectomy to remove a large herniation on March 15,

2006, and left L4-5 microdiscectomy to remove a herniation on April 1, 2010.  Tr. 15.  At step

three, the ALJ found that Dixson's impairments, either singly or in combination, did not meet or

equal the requirements of a listed impairment.  Tr. 16.

Because Dixson did not establish disability at step three, the ALJ continued to evaluate

how her impairments affected her ability to work.  The ALJ concluded that Dixson had the RFC

to "perform light work . . . except for occasionally climbing ladders, ropes, scaffolds;

occasionally stooping, kneeling, crouching and crawling; and frequently climbing of stairs and

ramps and frequently balancing."  *Id.*  At step four, the ALJ found that Dixson was able to

perform her past relevant work as a retail customer service representative (skilled sedentary

work) and customer service clerk (semi-skilled light work).  Tr. 19-20.  Accordingly, the ALJ

found that Dixson was not disabled and did not continue to step five of the analysis.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper

legal standards and the findings are supported by substantial evidence in the record.  42 USC

§ 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  The court

must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id.*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

Dixson argues that the ALJ erred by: (1) not providing clear and convincing reasons to discredit her testimony; (2) improperly assessing three medical opinions; and (3) determining that she retains the ability to perform her past relevant work.

## I.    Credibility

Dixson identified chronic lower back pain as her primary debilitating condition. The ALJ determined that Dixson's "medically determinable impairments could not reasonably be expected to cause the alleged symptoms and [her] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible." Tr. 19. Dixson argues that the ALJ failed to provide clear and convincing reasons for rejecting her subjective symptom testimony regarding the extent of her back impairments.

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [her] symptoms only by offering specific, clear and convincing reasons for doing so."

*Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  A general assertion that a claimant is not

credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not

credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d

915, 918 (9th Cir 1993).  The reasons proffered must be "sufficiently specific to permit the

reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."

*Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995) (citation omitted).  If, however, the "ALJ's

credibility finding is supported by substantial evidence in the record, we may not engage in

second-guessing."  *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002) (citation omitted).

The ALJ offered a number of specific reasons for discounting Dixson's testimony.  As

one reason, he found that the "fragmented medical evidence establishes no disability for any

continuous period of 12 months since the alleged onset date of March 12, 2006."  Tr. 19.  Dixson

argues that, to the contrary, the medical history reveals that she consistently sought treatment for

her impairments which persisted over the relevant time period.

The amount of treatment is "an important indicator of the intensity and persistence of [a

claimant's] symptoms."  20 CFR §§ 404.1529(c)(3), 416.929(c)(3).  Further, lack of objective

evidence supporting subjective testimony is relevant to a credibility determination.  *See* 20 CFR

§§ 404.1529(c)(2), 416.929(c)(2); *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001) ("While

subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated

by objective medical evidence, the medical evidence is still a relevant factor in determining the

severity of the claimant's pain and its disabling effects.").

Dixson's lower back pain began in 2005 when she was injured at work, suffering a

herniated disc in her lower spine at L4-L5.  Tr. 273.  Oisin O'Neill, M.D. eventually performed

microdiscectomy surgery in March 2006. Tr. 281-82. The ALJ noted that following the first operation, Dr. O'Neill stated that Dixson had "no objective abnormalities on his neurological evaluation" (Tr. 408) and that her post-operative MRI was largely normal (Tr. 316). Tr. 17-18. By September 2006, Dixson was not regularly taking pain medication. Tr. 18, 350. Dr. O'Neill discharged Dixson in November 2006 for an evaluation by a psychiatrist "from the perspective of rehabilitation." Tr. 407.

The ALJ also noted that while Dixson continued to complain of back pain into 2007, she received several steroid injection treatments which provided relief for one to three months with decreasing effectiveness. Tr. 18, 359. Additionally, the ALJ pointed out that despite her pain complaints in 2007, Dixson at times sold her prescription pain medications in order to purchase illicit drugs. Tr. 15, 366.

Despite Dixson's complaints of various levels of back pain, in January and May 2008, Robert Ingle, M.D. noted that she was able to sit, stand, and walk easily. Tr. 358, 361. After seeing Dr. Ingle, Dixson did not seek medical attention again until January 2009, when she sought relief for right leg radicular pain from Ezra Rabie, M.D., who administered an epidural nerve block. Tr. 450.

In April 2009 Dixson established care with John R. Ward, M.D., an internist, who began treatment for nicotine cessation but recommended that she return to her workers compensation doctor to treat her back pain. Tr. 578-79. Eight months later in December 2009, Dixson presented at an urgent care facility with acute back and hip pain, was given pain medication, and was advised to contact Dr. Ward. Tr. 531. She continued to complain of back pain to Dr. Ward in January and February 2010. Tr. 561-66. Dr. Ward ordered an MRI in February 2010 which

revealed a left disc protrusion at L4-5. Tr. 504. Dr. Ward consulted with two neurosurgeons (Jesse Staggs, M.D., and Steven Goodwin, M.D.) who recommended surgery due to an increase in the disc herniation.[3] Tr. 490-91. Dr. Goodwin performed the surgery in April 2010 which removed the significant herniation detected by the MRI and also included an extensive discectomy. Tr. 479-80.

Two weeks after surgery, Dixson was "overall doing well" and "not having any left leg symptoms as she was preoperatively," but was still experiencing soreness in her lower back when sitting or standing for long periods. Tr. 483. Six weeks after surgery, Dixson was "continuing to improve" and relayed to Dr. Staggs that she was riding her bike and returning to daily activities, including beginning college classes. Tr. 482. Although she still experienced pain on her right lower back, it was "not near as severe" as in the past; her gait was normal and her strength intact. *Id.* Drs. Staggs and Goodwin released her from any formal restrictions. *Id.* Concurrent with that release, Dixson reported to Dr. Ward that by May 2010, she had been able to discontinue morphine, reduce Percocet dosages, and felt like she was making progress on her back pain. Tr. 543-44.

One month later, however, Dixson discontinued Percocet and experienced increased pain, particularly in conjunction with beginning community college courses. Tr. 593-94. During June and July 2010, she noted difficulty sitting in class and focusing on her schoolwork, causing Dr. Ward to again prescribe Percocet. Tr. 591, 593-94. On the day of Dixson's hearing, Dr.

---

[3] The precise assessment by the neurologists was "new onset left leg radiculopathy secondary to disc bulge at left L4-5." Tr. 486.

Ward signed a letter from her attorney stating that Dixson was still recovering from back surgery and would be unable to perform full-time work because of the degree of her pain.  Tr. 599-600.[4]

Based on this record, the ALJ's determination that Dixson's medical treatment history did not support her complaints of continuous disabling back pain was supported by substantial evidence.  For several periods of months at a time, Dixson did not seek treatment for her back. Two of the three MRIs had largely normal results.  After her surgeries in both 2006 and 2010, Dixson showed improvement and was relieved of physical restrictions.  The ALJ did err by stating that Dixson did not seek treatment for her lumbar spine between March 7, 2008, and April 6, 2009.  Tr. 17.  However, that error was harmless.  Because the actual time period between treatments was May 2008 (Tr. 358) to January 2009 (Tr. 450), the ALJ's appraisal was off by three months.  That is simply is not a substantial enough length of time to constitute a reversible error.  In fact, Dixson did not seek medical treatment for her back pain after January 2009 until December 2009, nearly a full year later.[5]  Tr. 530-31.  In short, although the ALJ's recitation of the medical history was not correct in every detail, his finding that Dixson did not consistently seek treatment for her lower back pain over the alleged period of disability is supported by substantial evidence.

In discussing Dixson's history of substance abuse at step two, the ALJ noted that she sold her prescribed pain medications for methamphetamine in 2007.  Tr. 15, 366.  While the ALJ did not explicitly state that Dixson's drug-seeking behavior called into question her credibility, he

---

[4] The letter elaborated that full time employment entails 40 hours per week without excessive absences, defined as "two days per month on average, or more."  Tr. 499.

[5] Dixson argues that she also sought medical attention in July 2009.  However, that visit did not include any complaints or treatment relating to her lower back pain, but rather her shoulder and upper back.  Tr. 573-74. Therefore, the ALJ did not err by failing to mention that visit.

referenced it again when discussing the fragmented medical evidence with regard to her

credibility.  Tr. 19, 523 ("urgent care physicians suspected drug-seeking behavior" in April

2010).  Based on the context of the discussion, this Court is satisfied that the ALJ mentioned

Dixson's drug-seeking behavior when weighing her credibility.  Inappropriately obtaining

prescription medication is a sufficient reason to conclude that a claimant is not credible.  *Edlund*,

253 F3d at 1157; *see also Allgood v. Comm'r of Soc. Sec.*, 2013 WL 1858183 at *4 (ND Ohio

May 2, 2013) ("Consideration of a claimant's alleged drug-seeking behavior is also proper in

assessing the credibility of a claimant's statements to physicians regarding his physical pain.")

(citations omitted).  Dixson suggests that her previous methamphetamine addiction is not

inconsistent with her allegations of disabling back condition.  However, the issue is not whether

her previous drug addiction is consistent with back pain, but rather whether selling drugs

prescribed to treat back pain tends to suggest that her back pain was not as severe as alleged.

The ALJ also discredited Dixson because her "lifestyle is . . . inconsistent with

disability." Tr. 19.  Activities of daily living may be considered in assessing credibility.  If a

claimant is able to spend a substantial part of her day engaged in pursuits involving the

performance of physical functions that are transferable to a work setting, a specific finding as to

this fact may be sufficient to discredit a claimant's allegations.  *Morgan v. Comm'r of Soc. Sec.*,

169 F3d 595, 600 (9th Cir 1999).  Even where certain activities suggest some difficulty in

functioning, a claimant's testimony may be discredited to the extent those activities contradict

claims of a totally debilitating impairment.  *See Molina v. Astrue*, 674 F3d 1104, 1113 (9th Cir

2012) (citations omitted).  Here, the ALJ found that although allegedly disabled, Dixson was

able to attend community college from 2008 until graduation in 2010 while taking a full course

load.  Tr. 19.  While attending school, she was also raising her preschooler who was six years old

at the time of the hearing.  *Id.*  Further, Dixson had matriculated to a university by the time of the

hearing.  *Id.*  The ALJ found that "care of a child and enrollment in college are difficult

undertakings and there is no evidence in the record that she was ever incapable of meeting those

challenges."[6]  *Id.*

      Dixson argues that the ALJ failed to fully account for the special accommodations that

she was provided by the community college, namely an ergonomic chair, the ability to stand

during class as necessary, and extended testing time.  Dixson also testified that she borrowed a

laptop computer from school so that she could lay down while typing, preferred to spend time

lying down, and was able to rest between home activities.  Tr. 58-59.  Nonetheless, Dixson also

testified that during a two-hour class, she only needed to stand for a couple of minutes.  Tr. 58.

Dixson further testified that as long as she paces herself, she could independently care for her

young son, although he "carries the groceries" for her and "will vacuum."  Tr. 56.  Given

Dixson's equivocal testimony regarding her need to lay down and rest, the ALJ's reasoning is

not necessarily invalid.  *See Rollins*, 261 F3d at 857 ("It is true that Rollins' testimony was

somewhat equivocal about how regularly she was able to keep up with all of these activities, and

the ALJ's interpretation of her testimony may not be the only reasonable one.  But it is still a

reasonable interpretation and is supported by substantial evidence; thus it is not our role to

second-guess it."), citing *Fair v. Bowen*, 885 F2d 597, 604 (9th Cir 1989).  Where, as here, the

---

      [6]  Dixson suggests that she should be commended, rather than criticized, for becoming clean and sober and
successfully completing school.  It is not clear that the ALJ was criticizing Dixson, but to the contrary, simply
acknowledged that she had proven capable of handling difficult challenges.  Even if Dixson intended to state that
she should not be penalized for succeeding the face of adversity, the issue is whether and to what extent she is able
to work.  Social Security benefits are not awarded for effort or perseverance, but simply for disability.

evidence may be susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008).

In sum, the reasons given by the ALJ to discredit Dixson's symptom testimony are clear and convincing and supported by substantial evidence.

## II.    Medical Opinions

Dixson also argues that the ALJ erred in his consideration of the opinions of two treating doctors and one reviewing doctor. In order to reject the uncontroverted opinion of a treating or examining doctor, the ALJ must present clear and convincing reasons for doing so. *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005), citing *Lester v. Chater*, 81 F3d 821, 830-31 (9th Cir 1995). However, if a treating or examining doctor's opinion is contradicted by another doctor's opinion, it may be rejected for specific and legitimate reasons. *Id.* The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).

### A.    Dr. O'Neill

Dixson contends that the ALJ failed to give proper weight to the opinion of Dr. O'Neill, a neurosurgeon who treated her in 2006. On August 22, 2006, Dr. O'Neill opined that Dixson was not yet medically stable, permanently precluded from lifting more than 20 to 30 pounds, and limited to a sedentary or semi-sedentary position in a work setting. Tr. 410. In partially rejecting this opinion, the ALJ stated that "Dr. O'Neill's opinions are based on subjective symptoms and cannot be accepted as anything more than an advocacy on her behalf." Tr. 17. The basis of the ALJ's rationale was Dr. O'Neill statement that Dixson "has no objective

abnormalities on her neurological examination at this stage, but she has a lot of subjective symptoms." Tr. 17, 410.

"[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings." *Batson*, 359 F3d at 1195 (citation omitted). Dixson argues that an absence of objective medical evidence of a surgical problem is not inconsistent with Dr. O'Neill's opinion that she would need full rehabilitation and would have permanent work restrictions. However, by his own admission, Dr. O'Neill's opinion was not based on objective evidence. Thus, the ALJ had a legitimate reason to afford little weight to it. Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability. *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001).

Further, the RFC described by Dr. O'Neill is not wholly inconsistent with the ALJ's determination that Dixson could perform light work. For example, Dr. O'Neill's opinion that Dixson should not lift more than 20 to 30 pounds is not as limited as the range of light work in the Act's regulations. *See* SSR 83-10, *available at* 1983 WL 31251 ("[t]he regulations define light work as lifting nor more than 20 pounds at a time . . . ."). Also, Dr. O'Neill's opinion that Dixson would be limited to "sedentary or semi-sedentary work" is inconsistent his 20 to 30 pound lifting restriction since sedentary work involves "lifting no more than 10 pounds at a time." Tr. 408; SSR 83-10. Finally, as the ALJ noted, Dr. O'Neill only treated Dixson until November 2006 before discharging her. Tr. 17.

Thus, ALJ offered specific and legitimate reasons for affording Dr. O'Neill's opinions little weight.

### B.  Dr. Ward

Dixson also argues that the ALJ erred by giving little weight to the opinion of Dr. Ward that her pain would prevent her from performing full-time work. Tr. 599. The ALJ provided three reasons for rejecting Dr. Ward's opinion. First, Dr. Ward only began treating Dixson in April 2009, years after her alleged onset date. Tr. 17. Second, Dixson's decision to seek care from Dr. Ward coincided closely enough to the denial of her claims on reconsideration to be "too convenient and too consistent with a secondary gain motive to accept . . . as mere coincidence."[7] *Id.* Lastly, Dr. Ward did not begin treating Dixson for lumbar spine symptoms until January 2010, eight months after he began seeing her. *Id.* Dixson submits that all three of these reasons are invalid.

Even assuming that the ALJ erred with respect to the Dixson's "secondary gain motive," the other reasons are valid. It is undisputed that Dr. Ward only began treating Dixson in April 2009, three years after her alleged onset date and only treated her lumbar spine issues beginning in January of 2010.[8] Tr. 567. Thus the actual period of Dr. Ward's treatment of Dixson's allegedly disabling condition was only seven months. In fact, Dr. Ward's opinion does not even appear to be a definitive statement about any particular period of time. *See* Tr. 599 ("[T]he

---

[7] The medical record from Dixson's initial visit to Dr. Ward lists the primary "problem" as nicotine addiction, and the second "problem" as back pain. Tr. 578. Dr. Ward noted that "patient is requesting additional pain medications . . . [o]n discussion with patient, this [back pain] is a workman's comp issue . . . the issue will not be followed here in this office." *Id.*

[8] The record includes two additional visits by Dixson to Dr. Ward between April 2009 and January 2010, but neither visit appears to have included treatment for or discussion of her lower back pain. *See* Tr. 570-71, 573-74.

degree of pain [Dixson] is presently experiencing would prevent her from performing full time work[.]").

The record reflects that Dixson began experiencing pain in her lower spine and legs by January 2010 to such a degree that Dr. Ward referred her to neurologists and eventually followed her through a second lumbar discectomy surgery in April 2010. Tr. 485, 541-64. Following surgery, Dr. Ward's records indicate that Dixson was "doing better" and that her left leg seemed to be feeling much better. Tr. 547. Dr. Goodwin's records from the same period also indicate that Dixson was "doing well" and "not having any of the left leg symptoms as she was preoperatively." Tr. 483. Some weeks later, Dr. Ward noted that Dixson's pain was "slowly improving," that she had been able to discontinue her prescribed methadone, and that pain control with Percocet continued to be adequate. Tr. 545. At the same time, Dr. Goodwin noted continued improvement despite some pain and released her from formal restrictions. Tr. 482. By June 2010, Dixson had stopped taking Percocet, but reported to Dr. Ward that her pain was increasing as a result. Tr. 593. She also expressed difficulty sitting through her classes and having thoughts of obtaining illicit drugs to control the pain. *Id.* Finally, by July (the month of both the hearing and Dr. Ward's opinion), Dixson felt that the Percocet was not giving her good pain control and reported trouble sitting still and focusing on her school work. Tr. 591-92.

However, as the ALJ pointed out, Dr. Ward treated Dixson's allegedly disabling condition in the lower spine area for a very limited period of time, particularly relative to her onset date. Further, even when Dr. Ward treated Dixson's back and followed her through surgery, he noted periods of improvement. *See Warre v. Comm'r*, 439 F3d 1001, 1006 (9th Cir 2006) ("Impairments that can be controlled effectively with medication are not disabling for the

purpose of determining eligibility to SSI Benefits.").  Finally, Dr. Ward's opinion does not refer to a discernible period of time.  Accordingly, the ALJ found that the medical evidence that Dr. Ward relied upon was too sparse and failed to present a convincing picture of a progressively deteriorating condition.  While not necessarily the only possible analysis, the ALJ's finding is at least a reasonable interpretation based on substantial evidence in the record.

### C.    Dr. Athay

The ALJ also gave little weight to the opinion of S. Athay, M.D., an internist.  After reviewing the medical records, Dr. Athay opined on July 3, 2008, that Dixson suffered from chronic back pain, post-surgery, depression, and a history of substance abuse in remission. Tr. 496.  Dr. Athay further listed certain functional limitations for Dixson, including low stress, non labor-intensive, sedentary work.  *Id.*  Dr. Athay's notes include no recurrent bending, stooping, or lifting, no lifting a weight greater than 20 pounds, no prolonged walking or standing, and no drug and alcohol exposure.  *Id.*

The ALJ gave several reasons for affording little weight to Dr. Athay's opinion.  First, he noted that it was based on Dixson's subjective statements to a vocational counselor and a one-page "Psychological Review."  Tr. 17.  Those are the three pages in the record immediately preceding Dr. Athay's opinion (Tr. 493-95), but all of them are dated after Dr. Athay's opinion. Therefore, this reason cited by the ALJ is not supported by the record.  Nonetheless, as mentioned above, an ALJ may discredit physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by the objective medical findings.  *Batson*, 359 F3d at 1195.  Since Dr. Athay did not specify what records he reviewed, his short, single page report based on a review of unknown sections of the record lacks support.  *See Burkhart v. Bowen*, 956

F3d 1335, 1339-40 (9th Cir 1988) ("Dr. Harper provided nothing more than a statement of his unsupported opinion.  There was no description—either objective or subjective—of medical findings, personal observations or test reports upon which Dr. Harper could have arrived at his conclusion.").

Second, the ALJ noted that Dr. Athay "never evaluated or treated" Dixson.  *Id*.  That is true, but cannot be the sole reason to reject a reviewing doctor's opinion.

Third, the ALJ pointed out that Dr. Athay was apparently unaware that Dixson had returned to school a month prior to his evaluation and was successfully participating on a full-time basis.  *Id.*  As the Commissioner concedes, no evidence supports this conclusion.

Fourth, as the ALJ stated, Dr. Athay's opinion appears to have attributed some of Dixson's limitations to her substance abuse condition.  *See* 42 USC §§ 423(d)(2)(C), 1382c(a)(3)(J) ("[A]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.").  Therefore, the ALJ did not erroneously afford little weight to Dr. Athay's opinion.

Dixson further contends that Dr. Athay's opinion is consistent with the opinions of Drs. O'Neill and Ward.  However, as discussed above, the ALJ provided sufficient rationales to discredit the opinion of Dr. O'Neill (as admittedly not based on objective medical evidence) and Dr. Ward (as not including an analysis of Dixson's physical or mental limitations).  Moreover, the opinions of Drs. Athay, O'Neill, and Ward are inconsistent with each other in several important respects, from the amount of allowable lifting to Dixson's ability to sit for long periods as required in sedentary work.  To the extent that Dixson argues that these opinions should be

considered "on a continuum," her argument fails. As described above, substantial evidence in the record reflects periods of time when Dixson's back pain was improving and when she did not seek medical assistance for her back pain at all.

     **D.**    **Conclusion**

In sum, the ALJ offered valid reasons for rejecting the opinions of the three doctors based on substantial evidence in the record. Even if the evidence is susceptible to another reasonable interpretation, this Court does not have the discretion to displace the Commissioner's decision. *Tommasetti*, 533 F3d at 1038.

**III.**    **Past Relevant Work**

 Dixson argues that the ALJ erred in finding that Dixson was able to perform her past relevant work as a customer service representative and customer service clerk based on her RFC. Tr. 19-21. Dixson's objection to the ALJ's finding on this point is limited to the contentions that her pain would likely cause her to miss more than one day per month on average and that she was not fully medically stable in August 2006.

However, this argument is essentially based on Dixson's previous arguments that the RFC findings did not account for all her limitations because the ALJ improperly discounted her testimony and the testimony of medical experts. *See Stubbs-Danielson v. Astrue*, 539 F3d 1169, 1176-76 (9th Cir 2008). Because the ALJ did not commit reversible error in either of those ways, the ALJ's did not err by concluding that Dixson is able to perform her past relevant work.

///

///

///

18 - OPINION AND ORDER

## **CONCLUSION**

For the reasons stated above, the Commissioner's decision is based on proper legal standards and supported by substantial evidence.  Therefore, it is AFFIRMED and this case is DISMISSED.

DATED this 22nd day of May, 2013.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

19 - OPINION AND ORDER